1844.

MATTER OF
WATER COM-
MISSIONERS.

</div>

---

## In the Matter of the Water Commissioners and Pierre Van Cortlandt, et al.

Appraisers appointed to assess damages to the riparian owner arising from the diversion of the water of the river, should allow to a tenant of a mill (under such owner) the damages he will sustain.

Mode, recommended by the court, of assessing damages in favor of owners of unequal shares in different pieces of land and others on account of the diversion of water of a river.

Where the main body of water in a river has been controlled by a dam and turned and used by a mill for forty years and the dam and mill were maintained without objection, a perpetual right in such use of the water is thereby gained: unless a qualified right as to time is insisted on and proved by the party who attempts to narrow it. Even twenty years of such enjoyment would presume a grant.

The principles applicable to the use of river water, as stated by the court in *Wright* v. *Howard*, 1 Sim. & S. 190, recognized as in force here.

Where the fee of a mill under lease, using water turned from a river or a mill-site for future mill purposes, is devised with the addition of " with an equal proportion of water out of Croton River Dam," the gift of such proportion of water is as permanent as the gift of the mill.

Assessors acting under statute or by direction of a court to ascertain and report damages due to owners on account of the diversion of water, act properly in hearing evidence of prescription and grant, the better to ascertain rights and apportion accordingly.

**1844.**

MATTER OF
WATER COM-
MISSIONERS.

*October 7,*
**1844.**

*River.*
*Diversion*
*of water.*
*Mill.*
*Mode of*
*assessing*
*damages*
*on diver-*
*sion of wa-*
*ter.*

PETITION of Pierre Van Cortlandt and others, owners of lands contiguous to the Croton river, whose damages were about to be assessed at the instance of the Water Commissioners for and in consequence of the diversion of the waters of the river by means of the aqueduct.

The petition prayed that a final appraisement might be postponed until the decision of the court for the correction of errors could be had in a cause pending on a writ of error to the supreme court in the case reported, 1 Hill, 590, in relation to the rights of Philip G. Van Wyck as a residuary devisee to some of the lands; and until certain suits in partition, between different owners as tenants in common, could be carried through or the shares of infants could be sold for their benefit, so as to consolidate several of such rights and interests; and also, until by some decree or judgment of this court or some other competent tribunal, it could be ascertained and determined whether there were any rights by prescription to the use of the water on the southeasterly side of the river in favor of some of the owners on that side to the exclusion of other owners on the opposite side—or, that the appraisers might be directed to appraise the whole damages of the several owners of all the parcels holding as tenants in common, together in one appraisal, or the whole damages of the several owners of each respective parcel: to the end that the amount or aggregate of damages might be brought into this court and be here distributed amongst the several owners according to their respective rights.

Soon after the presentation of the petition of the decision of the court for the correction of errors on the writ of error above mentioned took place and copies of the opinions on which the judgment in the court below was reversed were laid before the vice-chancellor. That decision(*a*) definitively established the title of Philip G. Van Wyck, as residuary devisee under the will of his deceased uncle Philip Van Cortlandt, to all the lands of which the testator had died seized which were not otherwise specifically disposed of by his will and codicil.

(*a*) Since reported 7 Hill's R. 346.

Taking, then, the decision in the last mentioned case in connection with the facts set forth in the petition, the ownership or title of the several parties interested in the property affected by the diversion of the water of the Croton river appeared to be as follows: *First.* General Pierre Van Cortlandt was solely seized, as owner in fee, of six hundred acres of land lying along the northerly or right bank of the river, under the devise thereof to him in the will of his brother Philip Van Cortlandt, deceased, (and which was designated on the diagram annexed to the petition by the letter F.) *Second.* Philip G. Van Wyck was solely seized as owner in fee of the lot or parcel of land on the southerly or left bank of Croton river (designated on the said diagram by the letters A. A. and known as "Holman Mills.") It was the same property which had been devised by the will of Pierre Van Cortlandt the elder to the late Philip Van Cortlandt his son ; and by the will of the latter to Philip G. Van Wyck—he being entitled thereto under the devise of the residue, according to the decision of the court above mentioned. *Third.* As to certain parcels on the southerly side of the river (designated by the letters B. C. and E.) the ownership was as follows : General Pierre Van Cortlandt had three undivided fourth parts of each parcel as tenant in common, consisting of his own original share in B. and C. under the will of his father and in E. under a deed from his father dated the sixth day of January one thousand eight hundred and thirteen and of the two other like shares of his sisters Mrs. Beekman and Mrs. Van Rensselaer, which they had conveyed to him by deeds of the twenty-seventh day of October one thousand eight hundred and forty-two. The remaining one-fourth of each parcel which had belonged, in like manner, to the other sister Mrs. Catharine Van Wyck, passed by her will made in the year one thousand eight hundred and twenty-seven in moieties—one moiety or half part thereof to her son Theodorus for life, with remainder in fee to such of the children of Philip G. Van Wyck as should be living at the time of the death of Theodorus and the other half to Philip G. Van Wyck in fee simple, subject nevertheless to a power conferred upon the latter as executor to sell all or any por-

tion of her real estate as he should think proper. In the exercise of this power, Philip afterwards sold and conveyed the whole of the mother's share in the parcels B. C. and E. and in the parcel D. hereafter referred to, as well as in other lands to his brother Theodorus; and thereby extinguished his own and his children's title and interest; and Theodorus became seized in fee, in his own right as purchaser, of what was previously his mother's undivided one-fourth part of the parcels B. C. and E. : and he, afterwards, dying intestate, the same passed by descent to his son Abraham and to his two grand-sons Walter Budd and Abraham Van Wyck Budd as his heirs at law, so that the petition was correct in stating (as it did) that Abraham Van Wyck was seized of an undivided eighth part and Walter Budd and Abraham Van Wyck Budd each of an undivided sixteenth part of the parcels designated by the letters B. C. and E. subject, however, to the right of dower therein of Mrs. Mary Van Wyck, widow of Theodorus Van Wyck. *Fourth.* As to the tract or parcel of land lying along the south-easterly or left bank of the Croton river above Quaker's Bridge and designated by the letter D. on the diagram, the title and ownership at present appeared to stand thus: Pierre Van Cortlandt, the elder, had devised this part of his estate, with other lands contiguous, to his five children, including Philip, as tenants in common in equal shares. Philip, by his will, as made in the year one thousand eight hundred and twenty-four, undertook to devise his one-fifth of the property to his brother Pierre and three sisters equally. If this devise had taken effect, they would each have become seized of an undivided fourth of the whole, instead of a fifth; but, by a codicil made in the year one thousand eight hundred and thirty-one, Philip revoked that clause of the will which would have given to them his one-fifth in question. In the codicil, he alluded to the fact that, since the making of the will, he had purchased the shares of his brother and sisters in most of the land lying south and east of the Croton river which had belonged to the estate of his father. But it did not appear from the petition or other evidence before the court whether Philip had bought or acquired the title of his brother and sisters' shares in the lands along or

immediately adjoining the river, (which were designated on the diagram by the letter D.) although it did appear that he bought their shares in some other lands not bounded by the river.

In regard to the particular parcel D. lying along the river, the court, in the absence of all proof to the contrary, assumed the fact to be that Philip Van Cortlandt died seized of only one undivided fifth part thereof and (it being now a settled point that the general devise of the residue of his estate to his nephew Philip G. Van Wyck passed the title to all such lands as remained not specifically devised after revoking parts of the will by the codicil,) that this one-fifth did not descend to the heirs at law as property undisposed of by the will, but now belonged to Philip G. Van Wyck as such residuary devisee. It appeared, in the view of the court, that three of the other four-fifths belonging to General Pierre Van Cortlandt, namely, his own original one-fifth and the two which belonged to Mrs. Beekman and Mrs. Van Rensselaer conveyed to him by their deeds of the twenty-seventh day of October one thousand eight hundred and forty-two and that the remaining one-fifth, originally the undivided share of Mrs. Catharine Van Wyck, passed by her will in like manner as her one-fourth in the other parcels before mentioned and was included in the sale and conveyance from Philip G. Van Wyck to his brother Theodorus Van Wyck under the power of sale given by the will to Philip : so that here, likewise, Theodorus became seized in his own right as purchaser of his mother's undivided one-fifth of the parcel D. which he transmitted by descent to his son Abraham and to his two grand-children, the Budds. Of the lands along the easterly side of the river above Quaker's Bridge, therefore, Philip G. Van Wyck was then to be deemed the owner of one-fifth part; General Pierre Van Cortlandt of three-fifths ; Abraham Van Wyck of one-tenth ; and Walter Budd and Abraham Van Wyck Budd each of one-twentieth part. The shares of the three last named being subject to the right of dower therein of the widow of Theodorus Van Wyck.

Mr. *A. L. Jordan* and Mr. *Voris*, for the owners.

Mr. *D. B. Talmadge*, for the Water Commissioners.

THE VICE-CHANCELLOR :—(*After referring to the several pieces of property and rights of parties as before detailed.*) These are the same pieces of property in relation to which damages are to be assessed under four of the orders made by this court appointing appraisers and all bearing date the eighth day of March one thousand eight hundred and forty-two. One of these orders comprises the property A. A. (*Holman Mill,* so called,) now ascertained to belong to Philip G. Van Wyck solely. The damage to this property will be estimated by itself, in the manner contemplated and directed by the order and be awarded to Philip G. Van Wyck as the owner of the fee; and if there be a tenant of the mill holding under a lease, the appraisers must determine how much of the damage such lessee will be entitled to receive for his loss during the unexpired part of his term ; and the amount will be specified in their report accordingly.

Another order comprises the three pieces of property designated as B. E. and C. These all have the same set of owners ; and, therefore, the appraisers may, if they shall think proper, estimate and report the damage to the whole in the aggregate as one piece of property ; and, then, by an appointment, specify how much each owner shall receive out of the gross amount. But I think it will be best for the appraisers to take up each one of these parcels by itself and ascertain the amount of damage it has sustained ; and, then, bring the whole together into one sum and make the apportionment amongst the several owners or, having ascertained the damage to each of these pieces of property separately, they can then proceed to apportion the respective sums amongst the several owners.

One of the orders comprises the property D. on the diagram ; and directs the assessment of the damage done to this water front by the diversion. Of course, the appraisers will consider this separately from the other pieces of property along the river and make their report of the amount of damage which they shall find the owners here will sus-

tain, giving the aggregate amount first and, then, the sum apportioned for each one to receive.

Another order relates to the damage done to General Van Cortlandt's land on the opposite side of the river, represented on the diagram by F. Here, again, the appraisers will take up the subject of his damage separately from any other and award to him individually, as the owner, such an amount as they shall find he is justly entitled to. But, here, it seems, an important question arises and on which an opinion is asked from the court by way of direction or advice to the appraisers, namely, whether General Van Cortlandt is to be compensated as the owner of the land on the northerly side for one half of the natural flow of the river or for less than one half? That General Van Cortlandt owns the land to the centre of the river and indeed the whole bed of the river some distance below the mills appears from the boundaries and description of the six hundred acres in the will of his brother Philip, devising the same to him. *Prima facie*, therefore, he became entitled to the use or benefit of all the waters flowing naturally and without obstruction over that part of the bed of the river lying within his bounds. But it may be that, at the time of thus acquiring title, the whole of the water which, in its natural course, would have passed on his side, did not belong there and that a right to claim or use an equal part of the stream with other proprietors did not, then, exist as appurtenances to that particular land. It does, in fact, appear that, long anterior to the devise of the property and his acquisition of title, a wear or dam existed, turning the main body of the water from his side to the opposite side, where mills had been erected and which required all the power of the stream to carry them ; and that the water thus turned has been used for those mills continually and exclusively for a period of forty years or more and during which time the dam had been constantly maintained without objection until it was swept away with the mills by the great freshet in the year one thousand eight hundred and forty-one. At least, such are the facts in relation to the dam and the manner of using the water as laid before me in the affidavit of John F. Hollman.

This long and uninterrupted use is evidence of a right in the proprietors of the mills and mill sites on the south-easterly side to continue such use of the water there perpetually and for all time to come, unless it could be shown that such right, in its creation, related only to a temporary use or was to endure but for a limited time. The evidence of such a qualification must be produced by the party who claims that it was so : Woolrych's Law of Waters, 213; *Bealey* v. *Shaw*, 6 East's R. 208.

In *Wright* v. *Howard*, 1 Sim. & St. 190, the Vice-Chancellor of England stated the principle of the right to the use of the waters of rivers very clearly. The principle is as applicable here as it is in that country ; and there can be no other in reason or justice any where. He observes that, "*prima facie*, the proprietor of each bank of a stream is the proprietor of half the land covered by the stream, but that there is no property in the water. Every proprietor has an equal right to use the water which flows in the stream ; and, consequently, no proprietor can have the right to use the water to the prejudice of any other proprietor, without the consent of those proprietors who may be affected and no proprietor can either diminish the quantity of water which would, otherwise, descend to the proprietors below or throw the water back upon the lands off those above. Every proprietor who claims a right either to throw the water back above or to dimish the quantity which is to descend below, must, in order to maintain his claim, either prove an actual grant or license from the proprietor affected by his operations or must prove an uninterrupted enjoyment of twenty years." This term of twenty years is now adopted upon the principle of general convenience as affording a conclusive presumption of a grant.

This principle of a right by prescription or presumed grant from an uninterrupted enjoyment of the use of the water for milling purposes on the side opposite to General Van Cortlandt's individual property for twenty years and upwards, in the absence of all proof to the contrary, is sufficient in law to preclude him from claiming an equal participation with other proprietors in the use of the water power of the Croton river at that place. But this adverse

right does not rest merely on the presumption of a grant. There is evidence of an exprese grant or license to use the water for milling or manufacturing purposes on the south-easterly side, in exclusion of any right in General Van Cortlandt to use it for similar purposes on the opposite side : unless, indeed, as to a surplus, if any there should be. I allude to the evidence which the title papers furnish. In the first place, there is the lease, granted in the year one thousand seven hundred and ninety-two, by Pierre Van Cortlandt the elder and his son Philip to Underhill, of seventy acres of the river extending across and including some land on each side called a "Mill place." One object contemplated by this lease was the erection of a mill or mills which, at the expiration of the term of twenty-one years, should become the property of the lessors at a fair valuation. It is not specified on which side of the stream the mills should be placed, nor is the size or dimensions or quantity of power to carry them mentioned. All this was left to the option of the lessees without restriction ; but, whatever location should happen to be selected became, thereby, appropriated as the mill-seat, while, whatever description of mill they thought proper to erect, became, at once, entitled to the whole or to so much of the power of the stream as should be necessary to carry it and enable it to perform the work it was designed to do. Hence, also, the waters of the river to the extent that might be necessary became appropriated, likewise, to the act of the owners, in granting the lease to the purposes of the mill about to be built and, of course, to be drawn to that point where its use should be required. The mill having been located and built on the south-easterly side and the wear or dam having been constructed, as I infer, about the same time by which the water was turned to the mill, the right to use it there became a fixed and vested right by the act and consent of those who, at the time, had power so to fix it.

Nor is it to be regarded in the light of a temporary appropriation and use thus made of it which was to continue only during the existence of the lease to Underhill. It was evidently intended to be permanent, from the fact that the mill was not to be removed by the lessees, but was to be

paid for and remain an improvement upon and a benefit to the Van Cortlandt estate. It has remained; and the artificial works have been constantly kept up and those who have succeeded to the ownership of the mill and its appurtenances are, in my opinion, as much entitled to claim the benefit of the original appropriation of the water power to that site as the mill itself. In the next place, there is the will of Pierre Van Cortlandt the elder, made in the month of December one thousand eight hundred and five— and which took effect upon his death in the year one thousand eight hundred and fourteen—making a still more decisive appropriation and grant of the south-easterly bank of the river and of the water to be used on that side for milling or manufacturing purposes. For instance, with the parcel marked B. on the diagram, is given, a "portion of water out of the Croton River Dam, should there be a mill hereafter on the lot mentioned." The parcel C. is given as "all that mill-seat and lot of land whereon Robert Underhill built his mill, with a portion of water out of the Croton dam." The parcel A. A. is devised to his son Philip as "all that mill seat and lot of ground whereon he has a mill on the south side of Croton river, with an equal proportion of water out of Croton River Dam." And the small lot or parcel E. is granted by the deed of the sixth day of January one thousand eight hundred and thirteen as "a piece of land and mill place adjoining the river between the Underhill mill and the mill of his son Philip, with a right to part of the water out of the Croton dam and raceway in proportion to any of the mills," &c.

These particulars are set out in the petition. Now, it is evident that the testator gave all these pieces of property as mill-seats and for purpose of mills. Indeed, two of them were already occupied by mills and the remaining two he supposed capable of being improved in the same way. He, therefore, gave, with each piece of property, a water power or right to take the water from the dam for the use of the mills then erected and for other mills if ever made. The gift of the water was to be as permanent as the gift of the land and was intended to confer a vested right in both. As to the two mills then standing, it was a present vested right

to the water. As to other mills on parcels B. and E., the right was prospective. These water rights for milling purposes became attached to the mill sites; and belong to them. The extent of the right, with respect to quantity of water, will be the subject of inquiry before the appraisers; and whether it embraced the whole power of the stream or something less than the whole will depend on the wants or requirements of the mills as they were originally constructed and were accustomed to be worked. If the mills required the whole, then, no part of the water power, as such, remains to be appraised to the owner of land on the opposite bank. The compensation must be given where the loss falls and in proportion as it falls upon one and upon another. There may be something due to General Van Cortlandt for a portion of the stream as it was accustomed to follow over the dam and along the north-westerly side while the mills were in operation and supposing them still to exist. If this surplus is so considerable as to be turned to any account as a water power for mechanical or manufacturing purposes—and this is a subject of inquiry and for evidence before the appraisers—it will be so estimated or, if useful for no other purpose than to benefit the farm or lands contiguous in an agricultural point of view and the owner is deprived, either wholly or partially, of the benefit in that respect, his damages ought to be awarded according to the value for such purposes. In short, the appraisers must endeavour to award to each owner and each set of owners a fair and just compensation for whatever of water power or use of water they are deprived of and to which they are legally entitled according to their respective ownerships in the lands contiguous, having a due regard to the purposes for which such water rights are held and are capable of being used.

In accordance with this great leading principle and with the views which I have endeavored to explain, I think the appraisers decided correctly when they determined to bear evidence in relation to the rights and interests of parties as owners and proprietors of the water power in order to ascertain whether, by prescription or by grant, it belonged exclusively to the proprietors of the lands and mill-seats on

the south-easterly bank of the river and in what proportions and to whom the value thereof should be awarded.

This appears to me to be a necessary inquiry for the appraisers to make ; and they must be left to pursue it in the way they proposed, following, however, the track I have marked out for them, unless, however, they shall find occasion to deviate from it, in case evidence be produced proving a different state of facts in some particulars from what I have supposed to exist in relation to the rights of the parties, the situation of the property or the circumstances under which the water privileges have been held and enjoyed.

This opinion has been called for by the petition of the proprietors and not of the water commissioners ; and it is given rather as advisatory than as directory to the appraisers in this stage of the proceeding. There seems to be no occasion for an order embodying these principles or provisions. A copy of my opinion can be laid before the appraisers ; and they will give to it such consideration as the facts which they may be able to ascertain shall appear to warrant. There is one part of the prayer of the petition about which, however, it is necessary to make an order. It prays that Mr. Smith, who was appointed as guardian *ad litem* of certain infants to look after their rights and interests in this proceeding without their knowledge or consent, may be discharged from that duty and that other persons, of their own selection, may be appointed in his place. This is but reasonable and proper ; and an order to that effect can, now, be entered upon this petition. It appears, however, since the decision establishing the title of Philip G. Van Wyck, as residuary devisee, that Master Pierre Van Wyck, one of the infants, has no title or interest in any one parcel of the property to which these proceedings relate, nor has his mother, Mrs. Alice Van Wyck, any interest therein ; and that it is now necessary to assign a guardian only for the two infants Walter Budd and Abraham V. W. Budd.